60 Cal.Rptr.3d 55 (2007)
150 Cal.App.4th 1050
AMERON INTERNATIONAL CORPORATION, Plaintiff and Appellant,
v.
INSURANCE COMPANY OF the STATE OF PENNSYLVANIA et al., Defendants and Respondents.
Ameron International Corporation, Plaintiff and Appellant
v.
Harbor Insurance Company, Defendant and Respondent.
Nos. A109755, A112856.
Court of Appeal of California, First District, Division Five.
May 15, 2007.
As Modified on Denial of Rehearing June 13, 2007.
*61 Stanzler Funderburk & Castellon LLP and Jordan S. Stanzler, San Francisco, for Plaintiff and Appellant.
McCurdy & Fuller LLP, Kevin G. McCurdy and Rosemary J. Springer, Menlo Park, for Defendant and Respondent Insurance Company of the State of Pennsylvania.
Hinshaw & Culbertson, Robert J. Romero, Paul E. Vallone, Joseph J. De Hope, Jr., San Francisco, for Defendants and Respondents Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America), Pacific Employers Insurance Company, and St. Paul Surplus Lines Insurance Company.
Charlston, Revich & Chamberlin LLP, Ira Revich and Nicholas R. Andrea, Los Angeles, for Defendants and Respondents International Insurance Company and Puritan Insurance Company.
Burnham Brown, Thomas M. Downey, Tyler G. Olpin and James Y. Higa, Oakland, for Defendants and Respondents Transcontinental Insurance Company and Harbor Insurance Company.
Ericksen, Arbuthnot, Kilduff, Day & Lindstrom, Inc., and Andrew P. Sclar, San Francisco, for Defendant and Respondent Old Republic Insurance Company.
Hogan & Hartson LLP, David R. Singer, Los Angeles, Jonathan S. Franklin, Hollywood, and William J. Bowman, for Defendant and Respondent Twin City Fire Insurance Company.
Sonnenschein Nath & Rosenthal LLP, Michael A. Barnes, Sonia Martin, San Francisco, and Lee L. Raster, for Defendant and Respondent Great American Surplus Lines Insurance Company.
Certified for Partial Publication.[*]
SIMONS, J.
In this insurance coverage matter, plaintiff/appellant Ameron International Corporation (Ameron) seeks coverage from defendant/respondent insurers (collectively respondents)[1] for its $10 million settlement of a contract dispute with the federal government and for its related defense costs. The settlement occurred during a protracted administrative hearing before the United States Department of Interior Board of Contract Appeals (IBCA). Between 1978 and 1995, respondents issued a series of primary comprehensive and commercial general liability (CGL)[2] and excess/umbrella *62 policies to Ameron. With respect to these policies, Ameron contends the trial court too narrowly construed respondents' duties to defend and indemnify and, as a result, erroneously granted Harbor's motion for judgment on the pleadings and sustained the other respondents' demurrers, without leave to amend, to Ameron's operative third amended complaint (complaint).[3] Resolution of this matter requires an analysis of four Supreme Court decisions issued between 1998 and 2005 that described the limits of the duties to defend and indemnify an insured for its expenses in complying with environmental agency activity prior to the filing of a complaint.
In Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (Foster-Gardner) and Powerine I, supra, 24 Cal.4th 945, 103 Cal.Rptr.2d 672, 16 P.3d 94, the court examined several primary CGL policies. In Foster-Gardner, the court held that the duty to defend a "suit seeking damages," where "suit" was not defined in the policy, was triggered only by a civil action prosecuted in a court of law. (Foster-Gardner, at pp. 878-882, 77 Cal.Rptr.2d 107, 959 P.2d 265.) In Powerine I, at pages 950-951, the court held that in a policy imposing a duty to defend "`in any suit seeking damages'" and a duty to indemnify the insured for "`all sums that the insured becomes legally obligated to pay as damages,' where neither 'suit' nor `damages' are defined within the policy" the duty to indemnify is "limited to money ordered by a court" and "does not extend to any expenses required by an administrative agency pursuant to an environmental statute." In Powerine Oil Co., Inc. v. Superior Court (2005) 37 Cal.4th 377, 33 Cal.Rptr.3d 562, 118 P.3d 589 (Powerine II), the court acknowledged the importance of the precise wording of the policies' insuring agreements (id. at p. 389, 33 Cal.Rptr.3d 562, 118 P.3d 589) and concluded that policies which included the word "expenses," as well as "damages" in the insuring agreement provided a duty to indemnify for the cleanup of contaminated sites (id. at pp. 383, 398-405, 33 Cal. Rptr.3d 562, 118 P.3d 589). Finally, in a case decided the same day as Powerine II, the court reached the contrary conclusion because the "literal insuring language" of the excess/umbrella policies in that case neither referenced nor incorporated the term "expenses." (County of San Diego v. Ace Property & Casualty Ins. Co. (2005) 37 Cal.4th 406, 411, 33 Cal.Rptr.3d 583, 118 P.3d 607 (Ace).)
Here, the trial court relied on Foster-Gardner and Powerine I and concluded (1) the subject proceeding before the IBCA was not a covered "suit" because a "suit" means a civil action initiated by a complaint in a court of law; and (2) the money paid by Ameron to settle the dispute was not covered "damages" because "damages" are limited to money ordered by a court. As to those policies before us whose insuring agreements are similar to those construed in Foster-Gardner and Powerine I, and where "suit" is not defined, we conclude the bright-line rule announced by the *63 Supreme Court in those two decisions is properly applied, despite the significant differences between the IBCA proceeding, involved here, and environmental remediation orders. However, as to the policies before us that contain a definition of the term "suit,"[4] and/or provide indemnity for "loss," not damages, there may be a duty on the insurer to indemnify and/or defend. As to those policies, the trial court erred.[5]

PROCEDURAL AND FACTUAL BACKGROUND[6]
Ameron is a Delaware corporation whose principal place of business is Pasadena, California. Respondents are 11 insurance companies who provided Ameron with primary, excess and/or umbrella insurance coverage between 1978 and 1995.
Beginning in 1975, the United States Department of the Interior, Bureau of Reclamation (Bureau), entered into general contracts with Peter Kiewit Sons' Company (Kiewit) for the manufacture and installation of concrete siphons to be used in the Central Arizona Project, an aqueduct system. Pursuant to a subcontract with Kiewit, Ameron manufactured the siphons between 1975 and 1980. Ameron was required by its contracts with Kiewit to defend and indemnify Kiewit, and Kiewit is an insured under Ameron's insurance policies.[7]
In 1990, defects in the siphons were discovered, requiring their replacement or repair. As a result of the defective siphons, in 1992 the Central Arizona Water Conservation District filed an action against Ameron in federal district court in Arizona (hereafter the CAWD action). Ameron provided timely notice of the CAWD action to its insurers. The CAWD action was dismissed, and an appeal taken to the Ninth Circuit Court of Appeals was dismissed in 1996.[8]
In 1995, during the pendency of the CAWD action, the Bureau's contracting officer issued two final decisions finding that Kiewit was responsible for defects in the siphons, necessitating their replacement at a cost of approximately $116 million.[9] The government sought approximately $40 million in damages *64 from Ameron and Kiewit. Pursuant to their private contractual remedy, Ameron and Kiewit[10] elected to challenge the decisions of the Bureau's contracting officer before the IBCA. The government asserted that it had acted to prevent a "massive explosion" resulting from the rupture of the defective siphons. The defects alleged by the government involved "continuous and progressive deterioration" of the materials used to construct the siphons.
Ameron provided timely notice to respondents of the Bureau's claims and proceedings against Ameron and Kiewit. After 22 days of trial, on January 21, 2003, Ameron and Kiewit settled the government's claims for $10 million. Truck Insurance Exchange (Truck) one of Ameron's primary insurers, paid Ameron "certain sums with respect to the [Central Arizona Project] litigation."[11] Respondents failed or refused to pay for defense costs incurred in the litigation and failed or refused to pay for the settlement with the Bureau.

The Complaint
In April 2003, Ameron, in its own right and as an assignee of Kiewit's rights, filed its original complaint against respondents and others for breach of contract and related claims. Ameron filed its operative complaint on July 21, 2004.[12] In essence, the complaint alleges causes of action for breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, waiver and estoppel and contribution. The thrust of the complaint is that respondents failed or refused to defend Ameron or settle the IBCA litigation, failed to indemnify Ameron for its settlement of the IBCA litigation, and failed to investigate the potential of coverage.

Insurance Coverage[13]
Ameron purchased $15 million in primary insurance coverage[14] between July 1978 and March 1997. Truck issued primary policies between July 1, 1978 and July 1, 1988; INA issued primary policies between August 1, 1988 and August 1, 1992; and Zurich issued primary policies between September 1, 1992 and March 15 1997.
Between July 1,1978 and August 1, 1987, Pacific, Puritan, Old Republic, *65 Twin City, Transcontinental and Great American issued Ameron first layer excess and/or excess/umbrella insurance [15] policies to Truck's primary policies. No second layer excess insurance was in effect as to Ameron during that period.
For the period April 15, 1987 to July 1, 1988, International issued Ameron first layer excess/umbrella policies to Truck's primary policy, and, from July 1, 1987 to July 1, 1988, St. Paul issued a second layer excess policy. For the period August 1, 1988 to August 1, 1989, International issued Ameron a first layer excess/umbrella policy and St. Paul issued Ameron a second layer excess policy overlying an INA primary policy. During the period August 1, 1989 to August 1, 1991, Harbor and ICSOP issued Ameron second layer excess policies to the International first layer excess/umbrella and INA primary policies. For the period August 1, 1991 to December 1, 1995, ICSOP provided Ameron a first layer excess/umbrella policy to the underlying primary policies.
Ameron's complaint alleged that proceedings before the IBCA are "civil proceedings" in which damages may be awarded for "property damage," and that the IBCA acts in a "judicial capacity" when conducting hearings and deciding contested factual issues. Ameron also alleged that pursuant to the Contract Disputes Act of 1978 (the Act), it had the choice of challenging the decision of the Bureau's contracting officer by appealing that decision to the IBCA or by bringing an action in the United States Court of Federal Claims. (41 U.S.C. §§ 605, 609.) It asserted that the Act refers to an action filed in either the IBCA or the Court of Federal Claims as a "suit," triggering respondents' coverage duties.
The waiver and estoppel causes of action alleged that respondents knowingly and intentionally failed to inform Ameron that there was no coverage for the IBCA proceeding because an IBCA proceeding is not a covered "suit." Ameron alleged that had it been informed by respondents that IBCA proceedings are not covered under respondents' policies, Ameron "could have" proceeded against the Bureau in the Court of Federal Claims rather than before the IBCA.
The complaint's declaratory relief causes of action alleged that a present and justiciable controversy exists between Ameron and respondent excess insurers regarding coverage under respondents' policies, and the controversy exists whether or not the underlying primary insurance is exhausted. The declaratory relief cause of action also alleged, "Alternatively, the underlying insurance will be deemed exhausted if Ameron is permitted to select a single year of coverage for the settlement with the Bureau. [¶] ... Alternatively, the underlying insurance may be deemed inapplicable at some point in this litigation, if the court should determine that certain underlying insurance does not provide coverage, but [a respondent excess insurer] does so. [¶] ... The court is therefore requested to issue a declaratory judgment which will resolve these disputed issues and determine which policies are liable to provide coverage, and in which order."
*66 In addition, as an assignee of the rights of Truck, Ameron sought equitable contribution from INA and Zurich for the amount paid by Truck.
Ameron's action against respondents was dismissed after the trial court granted judgment on the pleadings to Harbor and sustained without leave to amend the demurrers filed by the other respondents to each cause of action.

STANDARD OF REVIEW
We review an order sustaining a demurrer without leave to amend de novo, exercising our independent judgment as to whether, as a matter of law, the complaint states a cause of action on any available legal theory. (See Lazar v. Hertz Corp. (1999) 69 Cal.App.4th 1494, 1501, 82 Cal. Rptr.2d 368.) In doing so, we assume the truth of all material factual allegations together with those matters subject to judicial notice. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.) However, no such credit is given to pleaded contentions or legal conclusions. (Financial Corp. of America v. Wilburn (1987) 189 Cal.App.3d 764, 769, 234 Cal. Rptr. 653.)
"A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. [Citation.] A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review. [Citations.] All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law; judicially noticeable matters may be considered. [Citation.]" (Kapsimallis v. Allstate Ins. Co. (2002) 104 Cal. App.4th 667, 672, 128 Cal.Rptr.2d 358.) Further, the court reviews the complaint liberally, giving it a reasonable interpretation, reading it as a whole and its parts in their context. (Code Civ. Proc, § 452; Fiol v. Doellstedt (1996) 50 Cal.App.4th 1318,1323, 58 Cal.Rptr.2d 308.)[16]

RULES OF INSURANCE POLICY INTERPRETATION
"`"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.]
"Ambiguity exists when an insurance policy provision `"is capable of two or more constructions, both of which are reasonable." [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does "[disagreement concerning the meaning of a phrase," or "`the fact that a word or phrase isolated from its context is susceptible of more than one meaning.'" [Citation.] "`[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found *67 to be ambiguous in the abstract.'" [Citation.] "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' [Citation.]
"But if `a term in an insurance policy has been judicially construed, it is not ambiguous and the judicial construction of the term, should be read into the policy unless the parties express a contrary intent.' [Citation.]" (CDM Investors v. Travelers Casualty & Surety Co. (2006) 139 Cal.App.4th 1251, 1256-1257[, 43 Cal.Rptr.3d 669] (CDM).) However, we apply this rule only after determining that "the context in which the construed term appears is analogous to the context of the term before us." (Lockheed Corp. v. Continental Ins. Co. (2005) 134 Cal. App.4th 187, 197, 35 Cal.Rptr.3d 799 (Lockheed).)
"`"`[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] ... "[T]he carrier must defend a suit which potentially seeks damages within the coverage of the policy." [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]' [Citation.]" [Citation.] [¶] To prevail ... on the issue of duty to defend, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. "In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." [Citation.]' [Citations.]" (Ortega Rock Quarry v. Golden Eagle Ins. Corp. (2006) 141 Cal. App.4th 969, 977, 46 Cal.Rptr.3d 517 (Ortega).)

LEGAL BACKGROUND

A. Foster-Gardner

In Foster-Gardner, the court determined the scope of the duty to defend against administrative actions in pre-1986 standard primary CGL policies. The insured had been ordered by the Department of Toxic Substances Control of the California Environmental Protection Agency to undertake certain remediation activities in regard to contamination at a site in Coachella, California. (Foster-Gardner, supra, 18 Cal.4th at pp. 861-863, 77 Cal. Rptr.2d 107, 959 P.2d 265.) The insured tendered defense of the order to four of its insurers. The pre-1986 CGL policies examined in Foster-Gardner, with minor nonmaterial differences, stated, "`the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, ... and may make such investigation and settlement of any claim or suit as it deems expedient....'" (Id. at p. 863, 77 Cal.Rptr.2d 107, 959 P.2d 265.) The terms "suit" and "claim" were not defined in the policies. (Id. at p. 864, 77 Cal.Rptr.2d 107, 959 P.2d 265.) [17] Utilizing a "`literal meaning' approach," the court concluded that the word "suit" in the duty to defend clause was not ambiguous and denoted "court proceedings initiated by the filing of a complaint." (Id. at p. 869, 77 Cal.Rptr.2d 107, 959 P.2d 265.) The court declined to take either a *68 "functional" or "hybrid" approach, rejecting the notion that "suit" means "anything equivalent to a suit." (Id. at pp. 871-872, 879, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Under the policies at issue in Foster-Gardner, an insurer had the duty to defend a suit, but discretion to investigate and settle a claim. (Id. at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) The `court concluded that under those policies, the insurer's duty to defend a "suit seeking damages" was limited to defending a civil action prosecuted in a court. (Id. at pp. 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265; see also Powerine I, supra, 24 Cal.4th at p. 959, 103 Cal.Rptr.2d 672, 16 P.3d 94.) Foster-Gardner held that, based on the policy language, the insurer's duty to defend did not extend to an administrative agency proceeding pursuant to an environmental statute, which was not a "suit," but rather implicated a "claim." (Foster-Gardner, at pp. 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
"Foster-Gardner was intended to 'create[ ] a "bright-line rule that, by clearly delineating the scope of risk, reduce[d] the need for future litigation,"' by avoiding the `"case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the `functional equivalent of a suit brought in a court of law.'" [Citation.]' [Citation.]" (CDM, supra, 139 Cal. App.4th at p. 1258, 43 Cal.Rptr.3d 669.) Thus, where "suit" and "claim" are not defined within the policy, "`suit' in the policies means a civil action commenced by filing a complaint," and "[a]nything short of this is a `claim.'" (Foster-Gardner, supra, 18 Cal.4th at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.)

B. Powerine I

In Powerine I, the Supreme Court considered the reach of the duty to indemnify in a pre-1986 standard primary CGL policy, and held that "the insurer's duty to indemnify the insured for `all sums that the insured becomes legally obligated to pay as damages'" under such a policy "is limited to money ordered by a court." (Powerine I, supra, 24 Cal.4th at pp. 960, 964, 103 Cal.Rptr.2d 672,16 P.3d 94.) The court concluded that the duty to indemnify did "not extend to all sums, or even any sum, that the insured becomes legally obligated to pay other than as damages." (Id. at p. 964, 103 Cal.Rptr.2d 672, 16 P.3d 94.)
Powerine I based its holding in part on the "Foster-Gardner `syllogism'": "The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a `suit,' i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond `damages,' i.e., money ordered by a court, but rather is limited thereto." (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal.Rptr.2d 672, 16 P.3d 94.)
Apart from the Foster-Gardner syllogism, Powerine I explained the term "damages," when viewed in either the narrow focus of the policy itself or the wider focus of the policy within the "legal and broader culture," is limited to money ordered by a court. (Powerine I, supra, 24 Cal.4th at pp. 961-962, 103 Cal.Rptr.2d 672, 16 P.3d 94.) In considering the term "damages" within the narrow focus of the policy itself, the court noted that the duty to defend and duty to indemnify provisions expressly link "damages" to a "`suit,' i.e., a civil action prosecuted in a court." (Id. at p. 962, 103 Cal.Rptr.2d 672, 16 P.3d 94.) As to the duty to defend, it is in a "suit" that "damages" are sought through the court's order. As to the duty to indemnify, it is in a "suit" that "`damages' are fixed in their amount through the court's order." (Ibid.) The court stated that when *69 the policy is viewed within the wider legal and broader culture, "`damages' exist traditionally inside of court," whereas "`harm' exists traditionally outside of court." (Ibid.)
Powerine I noted that use of the term "damages" in the insuring agreement of the pre-1986 standard CGL policy precluded a finding that a broad right to indemnification outside the context of a lawsuit was intended under the policy language. (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal.Rptr.2d 672, 16 P.3d 94.) "[O]ne would not speak of any `sum that the insured becomes legally obligated to pay as damages' apart from any order by a court ... because, as a sum that the insured becomes legally obligated to pay, `damages' presuppose an institution for their ordering, traditionally a court, albeit no longer exclusively. [Citations.] `Damages' do not constitute a redundancy to a `sum that the insured becomes legally obligated to pay,' but a limitation thereof." (Id. at p. 963, 103 Cal.Rptr.2d 672, 16 P.3d 94, fn. omitted.) The Supreme Court stated that limiting the term "damages" to "money ordered by a court" "commends itself to society generally as laying down a bright-line rule." (Id. at p. 965, 103 Cal. Rptr.2d 672, 16 P.3d 94.) This "has a tendency to promote fairness and efficiency in the judicial sphere," by "increasing certainty and decreasing uncertainty about the duty to indemnify." (Id. at p. 966, 103 Cal.Rptr.2d 672, 16 P.3d 94.)
Powerine I acknowledged that although "damages" traditionally means money ordered by a court, administrative agencies occasionally have the power to order damages. (Powerine I, supra, 24 Cal.4th at pp. 963, 969, 103 Cal.Rptr.2d 672, 16 P.3d 94.) However, the court noted that as to the pre-1986 standard CGL policy before it, "`damages' exist solely inside of court, especially in light of their linkage therein to a `suit'" that the Foster-Gardner court defined as a civil action prosecuted in a court. (Powerine I, at p. 969, 103 Cal. Rptr.2d 672, 16 P.3d 94.)
Powerine I further acknowledged that, while the duty to indemnify may embrace "all money ordered by a court," it does not extend to "any money in addition to that ordered by a court," i.e., expenses required by an administrative agency pursuant to an environmental statute. (Powerine I, supra, 24 Cal.4th at p. 966, 103 Cal. Rptr.2d 672, 16 P.3d 94.)
As the Court of Appeal in CDM noted, "Read together, Foster-Gardner and Powerine I stand for the proposition that the duty to defend a `suit' seeking `damages' under pre-1986 CGL policies is restricted to civil actions prosecuted in a court, initiated by the filing of a complaint, and does not include claims, which can denote proceedings conducted by administrative agencies under environmental statutes. Likewise, the duty to indemnify for `"all sums that the insured becomes legally obligated to pay as damages"' [citation] in the same standard primary policies is limited to money ordered by a court, and does not include expenses such as may be incurred in responding to administrative agency orders." (CDM, supra, 139 Cal. App.4th at p. 1259, 43 Cal.Rptr.3d 669.)

C. Powerine II

In Powerine II, the Supreme Court considered the extent of the duty to indemnify in standard form excess/umbrella policies.[18] The central insuring clauses of the policies provided: "`The Company hereby agrees ... to indemnify the Insured for all sums which the Insured shall be obligated *70 to pay by reason of the liability ... imposed upon the Insured by law ... for damages, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" on account of: ... property damage ... caused by or arising out of each occurrence happening anywhere in the world.'" (Powerine II, supra 37 Cal.4th at p. 395, 33 Cal.Rptr.3d 562, 118 P.3d 589.) The policies defined "ultimate net loss" as "`the total sum which the Insured, or any company as [its] insurer, or both, become obligated to pay by reason of ... property damage ... either through adjudication or compromise, and shall also include ... all sums paid ... for litigation, settlement, adjustment and investigation of claims and suits, which are paid as a consequence of any occurrence covered hereunder....'" (Id. at pp. 395-396, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
The Supreme Court focused on each policy's central insuring clause and held that this clause extended the insurers' indemnification obligation beyond court-ordered money damages to include expenses incurred in responding to government agency orders administratively imposed outside the context of a lawsuit. (Powerine II, supra, 37 Cal.4th at p. 398, 33 Cal.Rptr.3d 562, 118 P.3d 589.) The court noted that in the central insuring clause of the standard primary CGL policy such as that in Powerine I, it is "the single word `damages' " that limits the duty to indemnify to money ordered by a court. (Id. at p. 396, 33 Cal.Rptr.3d 562, 118 P.3d 589.) The court stated that the term "damages" in the excess policies serves the same purpose it serves in the standard primary CGL policy"it extends the indemnity obligation to `money ordered by a court' in a suit against the insured." (Id. at p. 399, 33 Cal.Rptr.3d 562, 118 P.3d 589.) However, the central insuring clause of the excess/umbrella policies at issue in Powerine II provided indemnification coverage for "damages" and "expenses," thereby extending coverage beyond "damages" alone and beyond "money ordered by a court." (Id. at p. 397, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
Powerine II noted that the policies' central insuring clause further defined the indemnification obligation by incorporating the definition of "ultimate net loss," which included sums the insured becomes obligated to pay, through "compromise" or "settlement, adjustment and investigation of claims" that do not necessarily reflect an underlying lawsuit. (Powerine II, supra, 37 Cal.4th at p. 397, 33 Cal.Rptr.3d 562, 118 P.3d 589.) The court concluded that "where the express insuring language of an excess/umbrella policy broadens indemnity coverage for sums paid in furtherance of a `compromise' or `settlement' of a `claim' initiated by an administrative agency for [remedial relief pursuant to an environmental statute], the insured's liability for such expenses falls within the policy's indemnification obligation" despite the absence of a lawsuit. (Id. at pp. 397-398, 33 Cal.Rptr.3d 562,118 P.3d 589.)
The Powerine II court next considered the policies' central insuring provisions in the context of the policies as a whole. Although the policies followed the form[19] of underlying standard primary CGL policies like those considered in Foster-Gardner and Powerine I, they also provided that the insurer agreed to pay the excess of "`the amount of ultimate net *71 loss ... in respect of each occurrence not covered by said underlying insurances,'" and thus provided umbrella indemnity coverage. That is, the policies provided "`alternative primary coverage as to losses "not covered by" the primary policy.' [Citations.]" (Powerine II, supra, 37 Cal.4th at pp. 398-399, 33 Cal.Rptr.3d 562, 118 P.3d 589.) The court concluded that the fact that the policies also provided umbrella indemnity suggests the insured would have expected the policies to provide broader coverage than that provided by the underlying primary policies. (Id. at p. 399, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
The court rejected the insurers' argument that the policies' "`assistance and cooperation'" clause[20] required an insurer to approve an out-of-court settlement or compromise as a condition of coverage. (Powerine II, supra, 37 Cal.4th at p. 400, 33 Cal.Rptr.3d 562, 118 P.3d 589.)[21] It made clear that whether the excess/umbrella policies afforded coverage for environmental costs ordered outside the context of a lawsuit "turns on the literal language of the insuring agreements." (Ibid.)[22]

D. Ace

On the same day it issued Powerine II, the Supreme Court also issued Ace, which considered whether a "nonstandard or 'manuscript form'" excess third party liability policy[23] afforded indemnity coverage for expenses incurred by the insured County of San Diego in responding to an administrative agency environmental remediation order and for sums expended by the insured to settle related third party property damage claims outside the context of a lawsuit. (Ace, supra, 37 Cal.4th at pp. 410-411, 33 Cal.Rptr.3d 583, 118 P.3d 607.)
The central insuring provision of the Ace policy required the insurer to indemnify the insured "`for all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement' arising from `damages' " resulting from the destruction or loss of use of tangible property. (Ace, supra, 37 Cal.4th at p. 411, 33 Cal.Rptr.3d 583, 118 P.3d 607.) The policy's "limits of liability" provision provided, "`Liability *72 under this policy shall attach to the company only after ... the named insured [has] paid or [has] been liable to pay, the full amount of [its] respective ultimate net loss liabilities as follows:....'" (Id. at p. 418, 33 Cal.Rptr.3d 583, 118 P.3d 607.) "Ultimate net loss" was defined in the policy as "`the sum or sums which the assured shall become legally obligated to pay in settlement or satisfaction of claims, suits or judgements ... includ[ing] all expenses from the investigation, negotiation and settlement of claims ... and shall include legal costs.'" (Ibid.)
This nonstandard excess policy provided the insured with excess liability coverage over and above its self-insured retention. Because the policy did not contain a duty to defend suits, the court found that the Foster-Gardner syllogism did not apply. (Ace, supra, 37 Cal.4th at p. 416, 33 Cal. Rptr.3d 583, 118 P.3d 607.) As in Powerine I, the central insuring provision obligated the insurer to indemnify the insured for sums the insured was obligated to pay for "damages." In Ace, "damages" was the sole term of limitation in the indemnity agreement (Ace, at p. 417, 33 Cal.Rptr.3d 583, 118 P.3d 607), and the term "ultimate net loss" appeared only in the limits of liability section of the policy (id. at p. 420, 33 Cal.Rptr.3d 583,118 P.3d 607).
Ace distinguished the central insuring provision in the Powerine II policies. That provision expressly contained the term "expenses" and then incorporated the definition of "ultimate net loss." The central insuring provision in the Ace policy, however, did not refer to or incorporate either term. (Ace, supra, 37 Cal.4th at pp. 419-420, 33 Cal.Rptr.3d 583, 118 P.3d 607.) Ace explained that including the definition of "ultimate net loss" in the limits of liability provision "merely serves to define the insured's total loss that will count toward such policy limits.... Nothing in the `limits of liability provision of the Ace policy purports to expand Ace's indemnification obligation, once triggered, to anything other than `damages.'" (Ibid.)
The Ace court also noted that unlike the policy in Powerine II, the Ace policy contained a no action provision,[24] and also provided that the insured "`shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.'" (Ace, supra, 37 Cal.4th at p. 420, 33 Cal.Rptr.3d 583, 118 P.3d 607.) The court explained that these provisions, which usually appear in policies including the duty to defend, are intended to preclude collusion between an insured and a third party claimant, and give the insurer the right to control the defense. These provisions undermine the suggestion that the term "damages" in the Ace policy extends the duty to indemnify to any settlement entered into by the insured. (Id. at pp. 420-421, 33 Cal.Rptr.3d 583, 118 P.3d 607.)
Ace concluded that the insuring clause in the standard CGL policy in Powerine I was substantively the same as the insuring clause in the Ace nonstandard excess third party liability policy and held that the out-of-court costs and expenses in responding to administrative agency orders and the settlements negotiated with third party claimants outside the context of a lawsuit *73 were not within the coverage terms of the Ace policy's insuring agreement. (Ace, supra, 37 Cal.4th at p. 421, 33 Cal.Rptr.3d 583,118 P.3d 607.)

E. Lockheed

Lockheed considered whether CGL manuscript policies issued from 1969 through 1977 required the insurer to defend administrative proceedings before the California Regional Water Quality Control Board that had not ripened into lawsuits filed in court. The defense clause of the policies provided that the insurer shall defend " 'any suit or action against the Insured alleging and seeking damages,'" but the insurer shall "`have the right to make such investigation, negotiation and settlement of any claim, suit or action as may be deemed expedient.'" (Lockheed, supra, 134 Cal.App.4th at pp. 198-199, 35 Cal.Rptr.3d 799.)[25]
In reliance on Powerine I, the insurer in Lockheed argued that it had no duty to defend because the phrase "`any suit or action'" is linked to the term "`damages.'" The court rejected that approach: "As Powerine I recognized, although `damages' usually refers to money ordered by a court, orders to pay money made by administrative tribunals may also be viewed as `damages.' [Citation.]" (Lockheed supra, 134 Cal.App.4th at p. 199, 35 Cal. Rptr.3d 799.) Lockheed then analyzed the policies' language in the context of the policies as a whole. As the court explained, it was undisputed that "suit" means lawsuit and "claim" means something short of a lawsuit, and the issue was whether "action" means some "third thing." As observed in Foster-Gardner, an administrative order is generally considered to be a "claim." Therefore, to construe an administrative proceeding as an "action" would create ambiguity. The court reasoned that the common understanding of both "action" and "suit" in the context of the policies means proceedings in court, and held that "any suit or action" unambiguously applies to proceedings in court and does not encompass administrative proceedings that do not involve a lawsuit. (Lockheed, at pp. 199-200, 35 Cal. Rptr.3d 799.)

F. CDM

On remand following Powerine II and Ace, CDM considered whether a 1986 umbrella CGL policy provided indemnity coverage for environmental response costs incurred pursuant to an administrative order. (CDM, supra, 139 Cal.App.4th at pp. 1256, 1262, 1267, fn. 5, 43 Cal.Rptr.3d 669.) The central insuring clause in the umbrella policy covered the plaintiffs for "`the ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages.'" (Id. at p. 1262, 43 Cal.Rptr.3d 669.) The policy defined "ultimate net loss" as "`the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by adjudication or settlement with the written consent of the [insurer].'" (Ibid.)
Consistent with Ace and Powerine II, the court in CDM concluded that although the central insuring clause used the term "ultimate net loss," the insured was indemnified only for that portion of the ultimate net loss "the insured [is] legally obligated to pay as damages." (CDM, supra, 139 Cal.App.4th at p. 1265, 43 Cal.Rptr.3d 669.) CDM noted that the central insuring clause did not contain the term "expenses" and concluded that this clause was substantively the same as the one in the standard CGL policy construed in Powerine I. *74 Both policies contained the "damages" limitation standing alone, made no reference to "expenses" and did not purport to further define the scope of indemnity coverage set out in the insuring clause by reference to the definition of "ultimate net loss." (Id. at pp. 1265-1266, 43 Cal. Rptr.3d 669.) Echoing Ace, CDM stated that the term "ultimate net loss" was "used in reference to what amount the insurer will pay after the insurer becomes obligated to pay rather than as a trigger of the insurer's obligation to pay." (CDM, at p. 1265, 43 Cal.Rptr.3d 669; id. at pp. 1263-1265, 43 Cal.Rptr.3d 669.)

DISCUSSION

I. Causes of Action Against INA

INA issued Ameron four successive primary CGL policies providing coverage between August 1, 1988 and August 1, 1992. The final three policies, from August 1, 1989 to August 1, 1992, contain definitions of the term "suit" that compel the conclusion that INA may have assumed a duty to indemnify and to defend Ameron. Thus, the trial court erred in sustaining a demurrer for breach of the duty to defend the IBCA litigation, breach of the duty of good faith and fair dealing, and contribution (causes of action 2, 4 and 62). We begin, however, with a discussion of the first INA policy, covering the period from August 1, 1988 to August 1, 1989, though it is not material to a ruling on those causes of action. We do so because our conclusions regarding it are determinative regarding the extent of coverage of excess/umbrella policies issued by International and St. Paul which overlie this INA primary policy.

A. 1988-1989 INA Policy (No. 10777665)

The insuring agreement provides: "The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, ... and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements." "Suit" and "claim" are not defined in the policy.
The insuring clause language in this 1988-1989 policy is substantively the same as the policy language interpreted by the Supreme Court in Foster-Gardner and Powerine I as to the duties to defend and indemnify. Thus, where as here, "suit" and "claim" are not defined within the policy, "`suit' in the policies means a civil action commenced by filing a complaint," and "[a]nything short of this is a `claim.'" (Foster-Gardner, supra, 18 Cal.4th at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Moreover, the duty to indemnify for "all sums which the Insured shall become legally obligated to pay as damages " (italics added), provided in this 1988-1989 policy, is limited to money ordered by a court. (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal.Rptr.2d 672, 16 P.3d 94.) Since the IBCA proceeding was not a civil action filed in a court of law, it was a "claim," for which Ameron could not reasonably expect a duty of defense or indemnity. In addition, an insurer is obligated to settle a case only when the policy indemnifies the insured for liability for the claimant's loss. If the policy does not indemnify for the loss, the insurer cannot be held liable for failing to settle. (See Johansen *75 v. California State Auto. Assn. Inter-Ins. Bureau (1975) 15 Cal.3d 9, 19, 123 Cal.Rptr. 288, 538 P.2d 744.) Since the policy did not create a duty to indemnify on the part of INA, no cause of action for breach of the covenant of good faith and fair dealing is stated.
Ameron argues, however, that this case "is completely outside the scope of Foster-Gardner, Powerine I, Powerine II and Ace because those cases "dealt exclusively with environmental administrative agencies that issued orders to abate or clean-up pollution." There is much to commend in Ameron's contention that the very different administrative proceeding in this case is a "suit." The IBCA is a quasi-judicial administrative agency board which holds hearings in which it considers and determines appeals from contracting officer decisions relating to contracts made by the Department of the Interior or any other executive agency. (15B Fed. Procedure L.Ed. (2006) Government Contracts, § 39:892, p. 117.) The appeal is commenced by the filing of a notice (43 C.F.R. § 4.102 (2005)), and, within 30 days after receipt of notice of docketing of the appeal, the appellant must file a complaint setting forth "simple, concise, and direct statements of each claim" (id. at § 4.107). The requirement of a filed notice and complaint eliminates one concern expressed in Foster-Gardner: avoidance of a "`case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the "functional equivalent of a suit brought in a court of law."'" (Foster-Gardner, supra, 18 Cal.4th at pp. 887-888, 77 Cal. Rptr.2d 107, 959 P.2d 265.) During the subsequent hearings, the opposing sides may subpoena witnesses, who are sworn and subject to cross-examination. (43 C.F.R. §§ 4.120, 4.123, supra.) The admissibility of evidence is governed by "the generally accepted rules of evidence applied in the courts of the United States in nonjury trials. ..." (Id. at § 4.122.) The administrative law judge who presides is authorized to grant any relief, including money damages, which would be available to a litigant asserting a contract claim in the Court of Federal Claims. (41 U.S.C. § 607(d); 15B Fed. Procedure L.Ed., supra, § 39:1085, at p. 243; e.g., Cherokee Nation of Okla. v. Leavitt (2005) 543 U.S. 631, 636, 125 S.Ct. 1172, 161 L.Ed.2d 66.) Generally, the decision of an agency board of contract appeals such as the IBCA is final, subject only to amendment, reconsideration or appeal to the United States Court of Appeals for the Federal Circuit. (15B Fed. Procedure L. Ed., supra, §§ 39:1083, 39:1121, pp. 242, 270.)
In Foster-Gardner, Powerine I and II, and Ace an environmental agency issued an order notifying the insured that it was a responsible party for pollution, and requiring remediation.[26] We find compelling a distinction embraced by Justice Spencer in her concurring opinion in Fireman's Fund Ins. Co. v. Superior Court (1997) 65 Cal. App.4th 1205, 1221-1222, 78 Cal.Rptr.2d 418. Justice Spencer concluded that such administration agency activity was "merely an investigative administrative proceeding seeking a negotiated settlement and a consent decree.... [T]he agency lacked the requisite authority to bind the disputants ... [and] this proceeding did not qualify as a suit." (Id, at p. 1222, 78 Cal.Rptr.2d 418.) But "the common, ordinary meaning of the word `suit' is broad enough to cover adjudicative administrative hearings.... [Citation.]" (Ibid.) The IBCA proceeding at issue here was, by any measure, an adjudicative administrative hearing. It was commenced by the filing *76 of a notice and complaint and was presided over by a judge governed by federal evidence rules and charged with setting damages for an alleged contract breach.
Were we writing on a blank slate, we would conclude that a knowledgeable government contractor, like Ameron, would reasonably expect the IBCA litigation was a "suit seeking damages" that triggered insurance coverage in a policy worded like the one in Foster-Gardner. But we are not. In Foster-Gardner, our high court consciously drew a "`bright-line rule that ... reduces the need for future litigation,'" by interpreting "suit," in a policy that left the term undefined, as "a court proceeding initiated by the filing of a complaint." (Foster-Gardner, supra, 18 Cal.4th at p. 887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Normally, a case serves as authority only for those issues framed by its facts. "The doctrine of precedent, or stare decisis, extends only to the ratio decidendi of a decision, not to supplementary or explanatory comments which might be included in an opinion. To determine the precedential value of a statement in an opinion, the language of that statement must be compared with the facts of the case and the issues raised. Only statements necessary to the decision are binding precedents; explanatory observations are not binding precedent. [Citations.]" (Western Landscape Construction v. Bank of America (1997) 58 Cal.App.4th 57, 61, 67 Cal.Rptr.2d 868.) Because the administrative proceedings in Foster-Gardner involved a pollution remediation order, we might fairly regard its broad rule as dicta when applied to the very different administrative proceedings in this case. But, `"[e]ven if properly characterized as dictum, statements of the Supreme Court should be considered persuasive. [Citation.]' [Citation.] Twenty years ago Presiding Justice Otto M. Kaus gave some sage advice to trial judges and intermediate appellate court justices: Generally speaking, follow dicta from the California Supreme Court. [Citation.] That was good advice then and good advice now." (Hubbard v. Superior Court (1997) 66 Cal. App.4th 1163, 1169, 78 Cal.Rptr.2d 819; accord, People v. Superior Court (Maury) (2006) 145 Cal.App.4th 473, 483, 51 Cal. Rptr.3d 670.)
Foster-Gardner's decision to define "suit" in its policy narrowly to preclude the triggering of insurance coverage by any administrative proceeding was "carefully drafted. It was not `... inadvertent, illconsidered or a matter lightly to be disregarded.' [Citations.]" (Hubbard v. Superior Court, supra, 66 Cal.App.4th at p. 1169, 78 Cal.Rptr.2d 819.) And, while we may believe the adjudicatory proceeding of the IBCA at issue here should trigger coverage under the policy language examined in Foster-Gardner, we are mindful of our subordinate role in the judicial hierarchy. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal. Rptr. 321, 369 P.2d 937.) Thus, to the extent the language of the policies before us is consistent with the policies' language in Foster-Gardner, Powerine I, Powerine II and Ace, we are bound by principles of stare decisis to follow those cases. (Auto Equity Sales, Inc., at p. 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

B. 1989-1992 INA Policies (Nos. HDOG 10778414, HDOG 14420757, & HDOG 15190413)

The insuring agreement of each of these three policies provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies.... The `bodily injury' or `property damage' must be caused by an occurrence.... We will have the right and *77 duty to defend any `suit' seeking those damages.... We may investigate and settle any claim or `suit' at our discretion...."
Each policy defines "suit" as: "a civil proceeding in which damages because of 'bodily injury,' `property damage,' `personal injury' or `advertising injury' to which this insurance applies are alleged. `Suit' includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent." No relevant definition of "damages" is provided in the policies. (See fn. 26, post.)
Ameron contends that Foster-Gardner and Powerine I are distinguishable because the pre-1986 standard CGL policies at issue in those cases did not define the term "suit." Ameron argues that by defining "suit" as a civil proceeding including arbitration, the INA policies do not restrict defense or indemnity coverage to lawsuits filed in a court.
INA responds that the definition of "suit" contained within its defense provision is limited to a civil proceeding alleging "damages" and its indemnity obligation is also limited to "damages." INA argues that Powerine I and its progeny have "unequivocally determined" that as a matter of law, "damages" can only be awarded by a court of law, and, therefore, INA had no obligation to defend or indemnify Ameron for the settlement reached in connection with the administrative IBCA proceeding. INA also asserts that since its policies' deductible endorsements also refer to the insurer's obligation to pay "damages," the endorsements bolster the parties' mutual understanding that INA's defense and indemnity obligations are limited to the payment of damages awarded by a court of law. With minor nonmaterial differences, the deductible endorsements provide that INA's "obligation to pay damages on behalf of the insured under this policy applies only to damages in excess of the amount of the deductibles.[27]
Because the INA policies are distinct contractual insurance policies whose wording and provisions were not before the Supreme Court in Foster-Gardner, Powerine I and 77, and Ace, we examine the policies de novo, and consider the definition of "suit" and "damages" in the context of each policy as a whole to determine whether the policy provides coverage for the IBCA proceeding that the parties agree was not a proceeding in a court of law.
The three INA policies before us define suit as a "civil proceeding ... including] an arbitration proceeding alleging ... damages." The policies contain no definition of the term "civil proceeding," so we construe it based on its common usage. There is no dictionary definition for the term. "Civil," however, is defined as: "relating to private rights and remedies that are sought by action or suit, as distinct from criminal proceedings." (Black's Law Diet. (8th ed.2004) p. 262, col. 1.) "Proceeding" is variously defined as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment," "[a]ny procedural means for *78 seeking redress from a tribunal or agency," and "[t]he business conducted by a court or other official body; a hearing." (Id. at p. 1241, col. 1.) Because "civil proceeding" is reasonably susceptible to more than one interpretation, including a hearing before an institution that is not a court, it is ambiguous and must be construed in the light most favorable to the insured. (CDM, supra, 139 Cal.App.4th at pp. 1256-1257, 43 Cal.Rptr.3d 669.) We may reasonably define "civil proceeding" to encompass a proceeding in which redress is sought from an administrative agency.[28]
The policies also define "suit" to include "arbitration." The term "arbitration" is not defined within the policy, but is commonly defined as, "the hearing and determination of a case in controversy by a person chosen by the parties or appointed under statutory authority." (Webster's 9th New Collegiate Diet. (1987) p. 99.) By definition, "arbitration" is not a lawsuit commenced by filing a complaint in a court of law; it is an alternative dispute resolution mechanism to a legal action filed in a court. (See Madden v. Kaiser Foundation Hospitals (1976) 17 Cal.3d 699, 713, 131 Cal.Rptr. 882, 552 P.2d 1178.)
This broad definition of "suit" within the duty to defend compels an equally broad definition of "damages." Thus, the promise in these policies to defend "an arbitration proceeding alleging ... damages"[29] requires a definition of "damages" broader than money ordered by a court.[30] Since "damages" is not defined within the INA policies, we again look to the plain meaning of that term within the context of the policies as a whole. In AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (AIU), the Supreme Court considered various lay and legal definitions of the term and concluded, "Whatever their semantic difference, the statutory and dictionary definitions of `damages' share several basic concepts. Each requires there to be `compensation,' in `money,' `recovered' by a party for `loss' or `detriment' it has suffered through the acts of another." (Id. at pp. 825-826, 274 Cal.Rptr. 820, 799 P.2d 1253, fns. omitted; accord Golden Eagle Ins. Co. v. Insurance Co. of the West (2002) 99 Cal.App.4th 837, 850, 121 Cal. Rptr.2d 682.) The AIU court construed "compensation" to "encompass any remunerative payment made to an aggrieved party." (AIU, at p. 826, fn. 11, 274 Cal.Rptr. 820, 799 P.2d 1253.) Where the CGL policies before us do not compel a more limited definition of "damages," we adopt the meaning set forth in AIU.
The indemnity obligation in these INA policies is also limited by the term *79 "damages": INA "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies ... caused by an occurrence." (Italics added.) INA argues we should construe "damages" in the indemnity clause differently, and more narrowly than "damages" in the defense clause. But accepting this argument would violate the rule of contract interpretation that "the same word used in an instrument is generally given the same meaning unless the policy indicates otherwise. [Citations.]" (E.M.M.I., Inc. v. Zurich American Ins. Co. (2004) 32 Cal.4th 465, 475-476, 9 Cal. Rptr.3d 701, 84 P.3d 385.) Moreover, limiting "damages" to money ordered by a court for purposes of indemnity, but not for purposes of defense would be nonsensical. While it is true that the duty to defend is broader than the duty to indemnify (Powerine I, supra, 24 Cal.4th at p. 961, 103 Cal.Rptr.2d 672, 16 P.3d 94), the duty to defend applies only to "`"`claims that create a potential for indemnity.'"'" (Ortega, supra, 141 Cal.App.4th at p. 977, 46 Cal.Rptr.3d 517, italics added). Further, the language of these INA policies is consistent with that limitation. Giving "damages" the disparate meanings sought by INA would sever the connection between the duties to defend and indemnify and require the insurer to defend suits before administrative tribunals for which it had no duty to indemnify. We decline INA's invitation to create this incongruity.
INA relies on Powerine I to argue the existence of a no action clause in its policies requires that the indemnity provision be limited to provide indemnification only for money ordered by a court. The no action clauses in the three INA policies are substantively the same, and state, typically, that "[n]o action ... shall lie against the [insurer] unless ... the Insured's obligation to pay shall have been finally determined either by [judgment] against the Insured after actual trial or by written agreement of the Insured, the claimant and the [insurer]." INA argues that Ameron has not contended, and cannot contend, that an "actual trial" occurred in the IBCA proceeding, and has not pled that any insurer consented to the settlement. INA's argument lacks merit.
In Powerine I, the Supreme Court, construing a pre-1986 CGL policy, stated that the reference to "a judgment" within the policy's no action clause "implie[d]" that the duty to indemnify is limited to money ordered by a court. (Powerine I, supra, 24 Cal.4th at p. 962, fn. 4, 103 Cal.Rptr.2d 672, 16 P.3d 94; cf. Ace, supra, 37 Cal.4th at pp. 420-121, 33 Cal.Rptr.3d 583, 118 P.3d 607; Powerine II, 37 Cal.4th at p. 401, 33 Cal.Rptr.3d 562, 118 P.3d 589.) It is certainly true, for example, that an arbitrator issues an "award" not a "judgment." (Code Civ. Proc, §§ 1283.4, 1285.) Applying Powerine I's implication here, however, would conflict with the insured's reasonable expectations generated by the broad definition of "suit" in the INA policies to include a court action or administrative proceeding as we have discussed, ante. Such a conflict must be resolved in favor of the insured. (CDM, supra, 139 Cal.App.4th at pp. 1256-1257, 43 Cal. Rptr.3d 669.) Further, the INA no action clauses also provide for recovery against the insurer for certain settlements, and do not suggest that such settlements must follow the filing of a lawsuit. (See Powerine II, supra, 37 Cal.4th at p. 397, 33 Cal.Rptr.3d 562, 118 P.3d 589 ["Sums that the insured becomes legally `obligated to pay' ... through `compromise' ... do not necessarily reflect an underlying court suit."].) Thus, these no action clauses do not trump the broad interpretation we have given to the insurer's duties in these *80 policies.[31]
We next address whether the IBCA proceeding is a civil proceeding, within the ambit of the policies' coverage,[32] and conclude that it is. Like an arbitration, IBCA proceedings involve the hearing and determination of a controversy, and like an arbitration, the administrative law judge or board member presiding over an IBCA proceeding issues a final decision and may award damages, i.e., monetary compensation, to the aggrieved party to the contract. Thus, an insured could reasonably expect that the IBCA proceeding at issue here was a covered "suit" under the policies' defense provision, and damages awarded in such a proceeding would be reimbursed under the policies' indemnity provision. Because Ameron has adequately pled that INA owed it a duty of coverage under INA's 1989-1992 policies, the trial court erred in sustaining the demurrer in favor of INA on the causes of action for breach of contract based on the duty to defend, breach of the duty of good faith and fair dealing based on INA's failure to defend, indemnify, settle and investigate, and for contribution (causes of action 2, 4 & 62).

II. Causes of Action Against International

International issued Ameron five successive first layer commercial excess/umbrella policies between April 15, 1987 and August 1, 1991. The three policies issued for the period August 1, 1988 to August 1, 1991 (Policy Nos. 531-000923-4, 531-001236-6 & 531-001679-4), follow form to the underlying INA policies issued for that period, and, as we discuss, provide coverage to Ameron, requiring us to reverse the trial court's rulings as to the causes of action against International.[33]
The "Coverage" section of these International policies provides:
Coverage A: "We will pay those sums that the `insured' becomes legally obligated to pay as damages arising out of an `occurrence' which are in excess of the underlying [INA] insurance.... The coverage provisions of the scheduled underlying [INA] policies are incorporated as part of this policy except for ... (c) any duty to investigate or defend any claim, or to pay for any investigation or defense, (d) the limits of insurance or (e) any other provision that is not consistent with a provision in this policy."
Coverage B: "With respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the underlying [INA] policies ..., or any other underlying insurance, we will pay on your behalf for loss caused by an `occurrence' which is in excess of the `retained limit' for liability imposed on you by law or assumed by you under contract for ... Property Damage...." "Loss" is not defined in the policies.
The defense settlement section of the International policies is identical to the parallel provision in the three INA policies discussed in part I.B., ante:
*81 "For damages covered by this policy, but not covered by any other insurance or underlying insurance, we have these obligations: [¶] A. We will defend any `suit' seeking damages covered by this policy; but we may investigate, negotiate, and settle any claim or `suit' at our discretion." "Suit" is defined in the definitions section as a "civil proceeding in which damages because of `bodily injury,' `property damage,' 'personal injury' or `advertising injury' to which this insurance applies are alleged. `Suit' includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent." "Damages" is not defined in the policy.

A. The Duty to Defend

International relies on Powerine I and Ace to fashion an argument similar to the one advanced by INA in part I.B., ante. International notes the defense settlement provision is limited to "damages" covered by its policies and refers to the duty to defend "any suit seeking damages." International argues that since "damages" is limited to money ordered by a court, the IBCA administrative agency litigation is not a covered suit. However, for the same reasons we rejected INA's argument, we conclude that the International policies' definition of "suit" is not limited to an action filed in a court of law, but may include an administrative proceeding. And, as we discussed in part I.B, since the International policies do not limit the definition of "suit" to an action filed in court, the term "damages" cannot be limited to money ordered by a court. As with the INA policies, we construe the term "damages" in the International policies to mean money recovered by a party for loss or detriment suffered through the acts of another. Neither that definition nor the terms of these International policies limit such damages to money ordered by a court. Consequently, an insured could reasonably expect that the IBCA proceeding was a covered suit under the International policies' defense settlement provision, which may trigger International's duty to defend.

B. The Duty to Indemnify

1. The 1988-1989 International Policy

Ameron argues that since the underlying 1988-1989 INA primary policy provides indemnity coverage for the IBCA litigation, Coverage A of the International policy applies, because it incorporates the indemnity coverage terms of the INA policy. The argument rests on a false premise. As we noted in part I.A., ante, the coverage language of that INA policy provides that "[INA] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages ... and [INA] shall have the right and duty to defend any suit against the Insured seeking damages...." "Suit" and "damages" are not defined in that INA policy. As we discussed previously, no duty of defense or indemnity was owed to Ameron under the 1988-1989 INA policy. Consequently, Coverage A in the overlying 1988-1989 International policy provides no indemnity coverage.
Coverage B of the 1988-1989 International policy provides that as to any loss covered by the policy, but not covered by the underlying INA policy, "we will pay on your behalf for loss caused by an `occurrence'...." (Italics added.) Thus, Coverage B provides umbrella coverage that serves as primary indemnity coverage for claims not covered by the underlying INA policy. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 8:210, at p. 8-50.) This indemnity obligation is limited by the term "loss." Since "loss" is not defined in the policy, we look *82 to its common usage. In the insurance context, "loss" is defined as "[t]he amount of financial detriment caused by an insured person's death or an insured property's damage, for which the insurer becomes liable." (Black's Law Diet, supra, at p. 963, col. 2.) This definition of "loss" is arguably broader than the common meaning of "damages," and is not limited to money ordered by a court. Moreover, as we discussed in part LB., ante, it would be inconsistent with the duty to defend, in general, and the International policy language, in particular, to interpret the policy to provide a defense in extrajudicial civil proceedings, but no indemnity for those same proceedings. Construing the ambiguous term "loss" in the International policy language in favor of the insured, as we must, we conclude that the policy does not limit the insurer's indemnity obligations to court actions. An insured could reasonably expect that the financial detriment suffered as a result of the IBCA proceeding would be reimbursed under the International policy's Coverage B indemnity provision. Having determined that this policy may impose both a duty to defend and to indemnify upon International, we conclude the trial court erred in sustaining the demurrer to causes of action for breach of the duty to investigate and defend, breach of the duty to settle, breach of the duty to indemnify, breach of the duty of good faith and fair dealing, and declaratory relief (causes of action 40, 42, 43, 44 and 45).

2. The 1989-1991 International Policies

The coverage language of the 1989-1991 International policies is identical to that of the 1988-1989 International policy.
Coverage A of the 1989-1991 International policies incorporates the indemnity coverage of the underlying 1989-1991 INA policies and provides indemnity coverage in excess of the underlying INA policies. As we noted in part I.B., ante, the 1989-1991 INA policies may provide a duty of indemnity for any damages awarded in the IBCA proceeding. Thus, the insured could reasonably expect that Coverage A of the International policy would apply to provide excess indemnity coverage for such damages. This provides an additional basis for our conclusion that the trial court erred in sustaining International's demurrer to causes of action for breach of the duty to investigate and defend, breach of the duty to settle, breach of the duty to indemnify, breach of the duty of good faith and fair dealing, and declaratory relief (causes of action 40, 42, 43, 44 & 45).

III. Causes of Action Against Twin City

Twin City issued Ameron three successive first layer excess/umbrella liability policies for the period July 1, 1982 to July 1, 1985. Each of the Twin City policies overlies a Truck primary policy.[34]
The 1984-1985 Twin City umbrella policy provides under Coverage: "The company will pay on behalf of the insured ultimate net loss in excess of the total applicable limit ... of underlying [Truck] insurance or the amount of the self-insured retention when no underlying insurance applies, because of bodily injury, personal injury, property damage or advertising injury to which this insurance applies, caused by an occurrence." (Fn. & boldface type omitted.) "[U]ltimate net loss" is defined as "all sums which *83 the insured and his or her insurers shall become legally obligated to pay as damages, whether by final adjudication or settlement with the company's written consent, after making proper deduction for all recoveries and salvage collectible." (Boldface type omitted.)
Under "Investigation, Defense and Settlement," the Twin City policy provides: "With respect to bodily injury, personal injury, property damage or advertising injury covered under this policy (whether or not the self-insured retention applies) and [¶] (1) for which no coverage is provided under any underlying insurance; or [¶] (2) for which the underlying limits of any underlying insurance policy have been exhausted solely by payments of damages because of occurrences during the period of this policy, [¶] The company will [¶] (a) defend any suit against the insured seeking damages on account thereof ...; but the company may make such investigation and settlement of any claim or suit as it deems expedient; [¶] (b) pay all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company...." (Boldface type omitted.)
' The "Definitions" section of the Twin City policy provides, "`suit' includes an arbitration proceeding to which the insured is required to submit or to which the insured has submitted with the company's consent." (Boldface type omitted.)
In relevant part, the Twin City policy contains a "Broad as Underlying Endorsement," which provides: "In the event the insured suffers a loss which is covered under the [Truck] policies of underlying insurance as set out in the schedule attached to this policy, the excess of which would be payable under this policy except for terms and conditions of this policy which are not consistent with the underlying insurance, then notwithstanding anything contained in this policy to the contrary, this policy shall be amended to follow and be subject to the terms and conditions of such underlying [Truck] insurance in respect of such paid loss." "The foregoing shall not, however, apply to: [¶] 1. Any coverage given under the underlying [Truck] insurance for limits less than the full limit of the said underlying policy as stated in the schedule hereto."
A broad as primary endorsement obligates the excess or umbrella insurer to pay for any loss within the scope of the primary policy, despite applicable exclusions in the excess or umbrella policy. (Housing Group v. California Ins. Guarantee Assn. (1996) 47 Cal.App.4th 528, 532-533, 56 Cal.Rptr.2d 378; Cornblum, Cal. Ins. Law Diet, and Desk Reference (West Group 2006) § B21, p. 384.) Thus, we interpret the Twin City broad as primary endorsement to mean that if the insured's loss is covered under the Truck primary policy but not under the Twin City policy, the Twin City policy will be amended to follow form to and incorporate the terms of the Truck policy which cover the loss.
The Truck primary policy is not appended to the complaint. In an action based on a written insurance contract, a plaintiff may plead the legal effect of the contract, rather than its precise language, by alleging the substance of its relevant terms. (Construction Protective Services, Inc. v. TIG Specialty Ins. Company (2002) 29 Cal.4th 189, 198-199, 126 Cal.Rptr.2d 908, 57 P.3d 372 (CPS); 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 480, p. 573.) However, here, the complaint does not contain an allegation as to whether or not the Truck primary policy provided Ameron indemnity and/or defense coverage for the IBCA litigation. However, the Twin City policy language provides indemnity and defense coverage to Ameron *84 whether or not the Truck policy provides coverage. Thus, as both parties have agreed, we may properly define the scope of the Twin City policy's coverage, though we lack information about the scope of the Truck policy's coverage.
Though the insuring agreement in this policy is not identical to the INA policies discussed in part I.B., ante, the analysis adopted in part LB. is instructive. Like those INA policies, this Twin City policy requires the insurer to defend the insured against "any suit ... seeking damages" and provides that "`suit' includes an arbitration proceeding." Thus, like INA, Twin City has agreed to defend an arbitration proceeding seeking damages, which requires a broader definition of damages than simply "money ordered by a court." Further, Twin City has undertaken a duty to indemnify for "ultimate net loss" and defined that term as "all sums which the insured ... shall become legally obligated to pay as damages, whether by final adjudication or settlement." As we explained in our discussion in part I.B., we apply the same broad definition of "damages" to the duty to indemnify as to the duty to defend. And, as a consequence, we conclude this Twin City policy may provide coverage to Ameron for both duties. Therefore, the trial court erred in sustaining the demurrer in favor of Twin City on the causes of action for breach of the duty to investigate and defend, breach of the duty to settle, breach of the duty to indemnify, breach of the duty of good faith and fair dealing, and declaratory relief (causes of action 24, 26, 27, 28 & 29).

IV. Causes of Action Against Transcontinental

The complaint alleges that the April 15, 1985 to April 15, 1986 Transcontinental policy is a first layer excess/umbrella policy over an underlying Truck primary policy. The complaint alleges the following as to the 1985-1986 Transcontinental policy (No. UMB 1693937):[35] "Under Coverage A, excess liability over underlying [Truck] insurance, the policy [provides that Transcontinental] 'will pay on your behalf loss in excess of the total applicable limits of liability of the underlying [Truck] insurance stated in the schedule. The provisions of the immediate underlying [Truck] insurance are, with respect to Coverage A, incorporated as part of this policy except for the duty to investigate and defend or to pay any costs resulting from such activities....' [¶] ... Under Coverage B, `excess liability over retained limit,' the policy states in part: `[w]ith respect to loss which is not covered in whole or in part by underlying [Truck] insurance, but which arises out of an occurrence covered by this policy, we will pay on your behalf for loss which is in excess of the greater of either your retained limit or the underlying limit of liability and which you may become obligated to pay as damages as a result of liability imposed upon you by law or assumed by you under a contract because of personal injury, property damage, or advertising injury caused by an occurrence.' [¶] ... The term `loss' is defined as `sums which you are legally obligated to pay as damages.....'"
The complaint does not contain an allegation as to whether or not the Truck primary policy provided Ameron indemnity and/or defense coverage for the IBCA litigation. Instead, it alleges, "Under Coverage A and B [of the Transcontinental policy] it must be determined whether there is coverage or not under the underlying [Truck] policy. Assuming, arguendo, there is no coverage under the Truck policy, then Transcontinental must pay for the *85 settlement with the Government, since the settlement represents a `loss.' [¶] The Transcontinental policy arguably provides under Coverage B broader coverage than the Truck policy."
Ameron concedes that the complaint does not specifically allege the terms of the Truck policy for the 1985-1986 period, but argues that "the Truck policies remained the same in all applicable yearsTruck provided a duty to defend a 'suit,' but did not define the term `suit.'" However, on appeal from the sustaining of a demurrer, we review the adequacy of allegations of Ameron's complaint, not assertions in its appellate briefs.
From the terms of the Transcontinental policy alleged in the complaint, it appears that the term "loss" in Coverage B is defined, while that same term in Coverage A is not. If this is correct, the extent of Transcontinental's duty to indemnify may depend upon whether the excess or umbrella provisions apply. However, the complaint's allegations do not sufficiently plead the legal effect of the Truck policy to make this determination. Thus, an opinion as to Transcontinental's coverage duties would be an impermissible advisory opinion. (See Younger v. Superior Court (1978) 21 Cal.3d 102, 119-120, 145 Cal.Rptr. 674, 577 P.2d 1014.)
Because it cannot be determined whether Transcontinental's policy provides coverage for the IBCA litigation, we conclude the trial court correctly sustained the demurrer in favor of Transcontinental on the causes of action for breach of the duty to settle, breach of the duty to indemnify, breach of the covenant of good faith and fair dealing, and declaratory relief (causes of action 30, 31, 33 & 34), but erred by denying Ameron leave to amend to properly plead the Transcontinental policy or the underlying Truck policy.

V. Causes of Action Against ICSOP

ICSOP issued Ameron five successive excess/umbrella policies between August 1, 1990 and December 1, 1995.

A. 1990-1991 ICSOP Policy (No. 4290-2705)

The August 1, 1990 to August 1, 1991 ICSOP excess policy is a second layer excess policy that follows form to the underlying International first layer excess/umbrella policy. The central insuring provision of the 1990-1991 ICSOP policy provides: "As respects accidents or occurrences, whichever is applicable, ... [ICSOP] agrees to afford the Insured such additional insurance as the issuers of the Underlying Coverage [International] ... would afford the insured by increasing the underlying limit combined provided that it is expressly agreed that liability shall attach to [ICSOP]: [¶] (a) only after the issuers of the Underlying Coverage have paid or have been held liable to pay the full amount of the said underlying limit, and [¶] (b) only as respects such additional amounts in excess thereof as would be payable by the issuers of the Underlying Coverage if the said underlying limit were amended as aforesaid, and [¶] (c) in no greater amount than the limit(s) set forth under the Declarations ultimate net loss as respects each accident or occurrence, which is applicable, taking place during the period of this policySubject to the limits) set forth under the Declarations ultimate net loss in the aggregate where applicable for each annual period during the currency of this Policy."
The central insuring language of the incorporated underlying 1990-1991 International policy states, "Coverage A. [¶] We will pay those sums that the `insured' becomes legally obligated to pay as damages arising out of an `occurrence' which are in *86 excess of the [INA] underlying insurance.... The coverage provisions of the scheduled underlying policies are incorporated as a part of this policy except for ... (c) any duty to investigate or defend any claim, or to pay for any investigation or defense...." "Coverage B. [¶] With respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the underlying policies listed on Schedule A, or any other underlying insurance, we will pay on your behalf for loss caused by an `occurrence' which is in excess of the `retained limit' for liability imposed on you by law...." The "Defense Settlement" section provides: "We will defend any `suit' seeking damages covered by this policy; but we may investigate, negotiate, and settle any claim or `suit' at our discretion." "Suit" is defined as "a civil proceeding in which daniages because of 'bodily injury,' `property damage,' `personal injury' or `advertising injury' to which this insurance applies are alleged. `Suit' includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent."
The "Limits of Insurance" of the incorporated underlying International policy states, "B. We will pay only that amount of the `Net Final Loss' that is in excess of the greater of [¶] (1) The total applicable limits of the underlying policies listed in Schedule A hereof, and any other collectible insurance...." "Net Final Loss" is defined as the total of: "(1) All sums that the 'insured' is legally obligated to pay as damages. This legal obligation may be the decision of a court or the result of a settlement ...; plus [¶] (2) All expenses not covered by underlying insurance incurred by or for the `insured' to investigate, negotiate, settle or defend any claim or `suit' seeking damages covered by this policy...."
The defense settlement provision in the 1990-1991 ICSOP policy is identical to that provision in the International policies discussed in part II., ante. As we concluded in part H.A., a reasonable insured would expect that the IBCA proceeding was a covered "suit" under the defense settlement provision, which may trigger ICSOP's duty to defend.
As we discussed in part H.B.2., Coverage A of the 1990-1991 International policy incorporates the indemnity coverage of the underlying 1990-1991 INA policy and provides indemnity coverage in excess of the underlying INA policy. In that discussion, we concluded that the 1990-1991 INA policy may provide a duty of indemnity for any damages awarded in the IBCA proceeding, and the insured could reasonably expect that Coverage A of the International policy may provide excess indemnity coverage for such damages. Because the 1990-1991 ICSOP policy follows form to the underlying International policy, a reasonable insured would expect that this ICSOP policy provides the same coverage, with higher limits. We conclude, therefore, the trial court erred in sustaining the demurrer to causes of action for breach of the duty to investigate and defend, breach of the duty to settle, breach of the duty to indemnify, breach of the duty of good faith and fair dealing, and declaratory relief (causes of action 56, 57, 58, 60 & 61).

B. 1991-1992 ICSOP Policy (No. 4291-6624)

The insuring agreement of the August 1, 1991 to August 1, 1992 ICSOP umbrella policy provides: "Coverage. The Company hereby agrees ... to indemnify the insured for all sums which the insured shall be legally obligated to pay by reason of the liability ... imposed upon the insured by law ... for damages, direct or consequential, and expenses, all as more *87 fully defined by the term `ultimate net loss' on account of ... property damage ... caused by or arising out of each occurrence...." "Supplemental Defense: It is agreed that with respect to any occurrence covered only by the terms and conditions of this policy except for the amount of the self-insured retention ... [ICSOP] shall ... defend any suit against the insured alleging liability insured under the provisions of this policy and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but [ICSOP] shall have the right to make such investigation, negotiation and settlement of any claim or suit as it deems expedient...."
The "Limit of Liability" section provides: "[ICSOP] shall be liable only for that portion of the ultimate net loss, excess of the insured's retained limit defined as ... [t]he total of the applicable limits of the underlying policies listed on the schedule of underlying insurance hereof and the applicable limits of any other underlying insurance providing coverage to the insured...."
The policy defines "Ultimate Net Loss" as "the amount payable in settlement of the liability of the insured after making deductions for all recoveries for other valid and collectible insurances, excepting however the policy(ies) of the primary insurer(s), and shall exclude all costs, which are paid by [ICSOP] in addition to the ultimate net loss." "Costs" is defined as "interest accruing after entry of judgment, investigation, adjustment and legal expenses (excluding, however, all office expenses of the insured, all expenses for salaried employees of the insured, and general retainer fees for counsel normally paid by the insured)." "Claim" and "suit" are not defined in the policy.
The defense obligation contained within the insuring agreement of this ICSOP policy is substantively the same as the policy language interpreted by the Supreme Court in Foster-Gardner, essentially providing for a duty to defend a suit seeking damages, where "suit" and "damages" are not defined within the policy. Since "suit" and "claim" are not defined within the ICSOP policy, "`suit' in the policies means a civil action commenced by filing a complaint," and "[a]hything short of this is a `claim.'" (Foster-Gardner, supra, 18 Cal.4th at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Consequently, the trial court correctly ruled that Ameron was not entitled to defense coverage under the 1990-1991 ICSOP policy.
ICSOP concedes that the indemnity language in the insuring agreement in this policy is identical to that in Powerine II. However, it argues that the definition of "ultimate net loss" contained in the ICSOP policy differs from that in Powerine 77.[36] ICSOP asserts that while the ultimate net loss definition in Powerine II was construed to broaden the insurer's indemnity obligation, the ultimate net loss definition in the ICSOP policy narrows that obligation and compels affirmance of the trial court's conclusion that ICSOP owes no duty to indemnify Ameron for the IBCA settlement. We disagree.
Powerine II first concluded that, "the addition of the term `expenses' in the central insuring clause ... extends [indemnity] *88 coverage beyond the limitation imposed were the term `damages' used alone, and thereby enlarges the scope of coverage beyond `money ordered by a court.'" (Powerine II, supra, 37 Cal.4th at p. 397, 33 Cal.Rptr.3d 562, 118 P.3d 589.) Since the central insuring clause of the ICSOP 'policy is identical to that in Powerine II, the term "expenses" in that clause enlarges the scope of coverage beyond money ordered by a court.
Powerine II also concluded that the definition of ultimate net loss in the policies before it, which included sums the insured becomes "legally `obligated to pay' through 'compromise' or the `settlement, adjustment and investigation of claims,'" did not necessarily reflect an underlying court suit. (Powerine II, supra, 37 Cal.4th at p. 397, 33 Cal.Rptr.3d 562, 118 P.3d 589.) Thus, the court determined that under a literal reading of the policies before it, the indemnification obligation extended beyond court-ordered money damages to include expenses incurred responding to government agency environmental cleanup costs. (Id. at p. 398, 33 Cal.Rptr.3d 562, 118 P.3d 589.) Like Powerine II, the definition of ultimate net loss in the ICSOP policy includes amounts payable in settlement of the insured's legal liability, and therefore does not necessarily reflect an underlying court suit.
However, unlike the policies in Powerine II, the definition of ultimate net loss in the ICSOP policies excludes "costs" paid by ICSOP, and "costs" is defined to include "legal expenses." ICSOP construes these policy terms to mean that "costs" are not included within the policy's indemnity obligation, and any "expenses" related to a "claim" ICSOP pays, are within its discretionary right to settle a "claim." Again, we disagree. We interpret the definitions of "ultimate net loss" and "costs" to mean that legal expenses paid by the company are excluded from "ultimate net loss," but legal expenses paid by the insured are included within "ultimate net loss." Thus, nothing in the definition of "ultimate net loss" narrows the scope of indemnity coverage so as to preclude coverage for Ameron's IBCA settlement or for the expenses it incurred. Our interpretation of this ICSOP policy provides an additional reason to conclude the trial court erred in sustaining ICSOP's demurrer to causes of action 56, 57, 58, 60 and 61.

C. 1992-1995 ICSOP Policies (Nos. 4292-7425, 4293-7722 & 4294-8226)

Given our determination the trial court erred in sustaining ICSOP's demurrer, it is not strictly necessary to our resolution of Ameron's appeal of the trial court's ruling in favor of ICSOP to examine the 1992-1995 ICSOP excess/umbrella policies. But we do so for the benefit of the parties and the trial court.[37] Each of these ICSOP policies contains an insuring agreement which provides: "Coverage. To pay on behalf of the insured that portion *89 of the ultimate net loss in excess of the retained limit as hereinafter defined, which the insured shall become legally obligated to pay as damages to third parties for liability imposed upon the insured by law...." The insuring agreement also contains the following "Defense, Settlement and Supplementary Payments" provisions: "Should applicable underlying insurance(s) become exhausted by payment of covered claims, this insurance will continue in force as underlying insurance and shall defend any suit arising out of a covered occurrence.... As respects occurrences not covered under the underlying insurance(s), but covered by this policy, [ICSOP] shall likewise defend any suit ... and will make indemnity payments, including the insured's retained limit.... [¶] In addition, [ICSOP] shall have the right to investigate, negotiate and settle any claim or suit as it may deem expedient...." "Suit" and "claim" are not defined in the policy.
The "Limit of Liability" section provides: "(A) [ICSOP] shall be liable only for that portion of the ultimate net loss, excess of the insured's retained limit defined as ... the total of the applicable limits of the underlying policies listed on the schedule of underlying insurance hereof and the applicable limits of any other underlying insurance providing coverage to the insured...."
"Ultimate Net Loss" is defined as "the amount payable in settlement of the liability of the insured after making deductions for all recoveries for other valid and collectible insurances, excepting however the policy(ies) of the primary insurer(s), and shall exclude all costs, which are paid by [ICSOP] in addition to ultimate net loss." "Costs" is defined as "any expenses incurred for the adjustment of the claim including, but not limited to, defense expenses, investigation expenses, and all expenses described in [the Defense, Settlement and Supplementary Payments section]."
Ameron contends that the 1992-1995 ICSOP policies provide the company will indemnify for "ultimate net loss," and define ultimate net loss to include payment for settlement and "expenses." Therefore, Ameron argues the ICSOP policies are similar to the policies at issue in Powerine II, in that indemnity coverage is not restricted to an action filed in court. Thus, Ameron argues these policies cover the IBCA settlement at issue here.
We conclude, however, the indemnity language contained within the 1992-1995 ICSOP policies' central insuring clause is substantially the same as that construed in CDM, supra, 139 Cal.App.4th 1251, 43 Cal. Rptr.3d 669. The term "damages" in the insuring clause is the trigger of ICSOP's indemnity obligation, not the phrase "ultimate net loss," which appears only in the Limits of Liability section. Therefore, the trial court correctly ruled that Ameron was not entitled to indemnity coverage under the 1992-1995 ICSOP policies.
In addition, the defense obligation contained within the insuring clause of the 1992-1995 ICSOP policies is substantively the same as the policy language interpreted by the Supreme Court in Foster-Gardner. Thus, where as here, "suit" and "claim" are not defined within the policy, "`suit' in the policies means a civil action commenced by filing a complaint," and "[a]nything short of this is a `claim.'" (Foster-Gardner, supra, 18 Cal.4th at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Consequently, the trial court correctly ruled that Ameron could not reasonably expect defense coverage under the 1992-1995 ICSOP policies, since the IBCA litigation is not a suit filed in court.

VI. Causes of Action Against St. Paul

St. Paul issued Ameron second layer excess liability policies for the period July *90 1, 1987 to July 1, 1988, and August 1, 1988 to August 1, 1989, which overlie International's first layer excess/umbrella policies for the same period.[38] We conclude that the 1988-1989 policy (No. LC05519681) may provide indemnity coverage to Ameron, and the trial court erred in sustaining the demurrer without leave to amend to Ameron's causes of action for breach of the duty to settle, breach of the duty to indemnify, breach of the duty of good faith and fair dealing, and declaratory relief (causes of action 47, 48, 49 & 50).
The insuring agreement of the 1988-1989 St. Paul policy provides: "Coverage [¶] To indemnify the Insured, in accordance with the applicable provisions of the `immediate underlying [International] policy' for the amount of `loss' which is in excess of the applicable Limits of the `underlying [International] insurance'.... [¶ ] The provisions of the `immediate underlying [International] policy' are incorporated as part of this Policy except for any obligation to investigate or defend and pay for costs and expenses incident to the same, the amount of the limits of liability, any `other insurance' provision and any other provisions therein which are inconsistent with the provisions of this Policy."
The St. Paul policy defines "claim" as "a demand in which damages are alleged," and defines "suit" as "a civil proceeding in which damages are alleged, including but not limited to an arbitration proceeding for such damages to which the Insured must submit or submit with [St. Paul's] consent." In an amendatory endorsement to the policy, "loss" is defined as, "the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the Insured is legally liable, after making deductions for all recoveries, salvages and other insurances (whether recoverable or not) other than the `underlying insurance' and excess insurance purchased specifically to be in excess of this Policy. `Loss' also includes investigation, adjustment, defense or appeal costs and expenses incident to any of the foregoing." "Damages" is not defined in the policy.
In part II.B.1., ante, we concluded the Coverage A indemnity provision in the 1988-1989 International policy does not apply in this case, but the policy's Coverage B indemnity provision does apply, because it provides umbrella coverage for the underlying INA policy and does not limit the insurer's indemnity obligations to "damages" but to "loss." Since the term "loss" does not require a court action, the insured could reasonably expect that any damages awarded in the IBCA proceeding would be reimbursed under the International policy.[39]
St. Paul relies on its policy's "Action Against Company" condition which provides: "No action shall lie against [St. Paul] unless, as a condition precedent thereto, the Insured shall have fully complied *91 with all the terms of this Policy. [¶] Any person or organization or the legal representative thereof who has secured a judgment against the Insured shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. Nothing contained in this Policy shall give any person or organization any right to join [St. Paul] as a co-defendant in any action against the Insured to determine the Insured's liability...."
In reliance on Hamilton v. Maryland Casualty Co. (2002) 27 Cal.4th 718, 117 Cal.Rptr.2d 318, 41 P.3d 128, St. Paul then asserts that indemnity payments can only be pursued by a judgment creditor, and since there is no judgment creditor, neither Ameron nor anyone else can enforce the IBCA settlement. St. Paul contends that as a matter of law, "[a]bsent a litigated excess judgment, a refusal by an excess carrier to pay a negotiated settlement entered into by the insured without participation of the excess insurer is not actionable against the excess carrier."
The simple answer to St. Paul's contention is that it raises a factual issue whether it consented to Ameron's settlementwhich is outside the face of the complaint and the policies appended thereto, and therefore is not appropriately considered in reviewing the court's ruling on demurrer. Hamilton, relied upon by St. Paul, is inapposite because it was an appeal from a summary judgment where the insurer's lack of participation in the insured's settlement was an undisputed fact. (Hamilton v. Maryland Casualty Co., supra, 27 Cal.4th at p. 723, 117 Cal.Rptr.2d 318, 41 P.3d 128.) In addition, nothing in the "Action Against Company" condition provides that coverage is limited to claims reduced to a judgment. And the insuring agreement expressly provides indemnity for "loss" which is defined as "sums paid as damages in settlement of a claim or in satisfaction of a judgment." (Italics added.) Since the St. Paul policy defines "claim" as "a demand in which damages are alleged," it clearly envisions paying an insured damages to settle a matter which has not yet ripened into a lawsuit. Consequently, the trial court erroneously sustained without leave to amend the causes of action for breach of the duty to settle, breach of the duty to indemnify, breach of the covenant of good faith and fair dealing, and declaratory relief (causes of action 47, 48, 49 & 50).
VII-XI[**]

DISPOSITION
For the reasons stated, the judgments are affirmed in part and reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion. Each party shall bear its own costs on appeal.
JONES, P.J., and NEEDHAM, J., concur.

APPENDIX

*92
 AMERON COVERAGE CHART[48]
--------------------------------------------------------------------------------------
 1978-1979 1979-1980 1980-1981 1981-1982
--------------------------------------------------------------------------------------
Pacific Puritan Puritan Old Republic
XMO-00-19-15 UL-67-27-62 UL-67-37-91 ORZU-4242
07/15/78-07/01/79 07/01/79-07/01/80 07/01/80-07/01/81 07/01/81-07/01/82
$1 million excess $9.5 million excess $9.5 million excess $9.5 million excess
of $1 million of $500,000 of $500,000 of $500,000
Truck Truck Truck Truck
---------------------------------------------------------------------------------------
XXX-XX-XX
07/01/78-07/01/79 07/01/79-07/01/80 07/01/80-07/01/81 07/01/81-07/01/82
$1 million $500,000 $500,000 $500,000
=======================================================================================
 1982-1983 1983-1984 1984-1985 1985-1986
---------------------------------------------------------------------------------------
Twin City Twin City Twin City Transcontinental
TXU-103836 TXU-106532 TXU-111849 UMB 1693937
07/01/82-07/01/83 07/01/83-07/01/84 07/01/84-07/01/85 04/15/85-04/15/86
$14.5 million excess $24.5 million excess $24.5 million excess $1 million excess
of $500,000 of $500,000 of $500,000 of $1 million
---------------------------------------------------------------------------------------
Truck Truck Truck Truck
N00-03-4136
07/01/82-07/01/83 07/01/83-07/01/84 07/01/84-07/01/85 07/01/85-07/01/86
$500,000 $500,000 $500,000 $1 million
=======================================================================================
 1986-1987 1987-1988 1988-1989 1989-1990
---------------------------------------------------------------------------------------
 St. Paul St. Paul Harbor
 LCO-55-18326 LCO-55-19681 HI 239376
 07/01/87-07/01/88 08/01/88-08/01/89 08/01/89-08/01/90
 $5 million excess $5 million excess $10 million excess
 of $6 million of $6 million of $6 million
---------------------------------------------------------------------------------------
Great American International International International
6CM07739 XXX-XXXXXX-X XXX-XXXXXX-X XXX-XXXXXX-X
04/15/86-04/15/87 04/15/87-07/01/87 08/01/88-08/01/89 08/01/89-08/01/90
$2 million excess $5 million excess $5 million excess $5 million excess
of $1 million of $1 million of $1 million of $1 millio
 XXX-XXXXXX-X
 07/01/87-07/01/88
 $5 million excess
 of $1 million
---------------------------------------------------------------------------------------
Truck Truck INA INA
N0003-41-36 N0003-41-36 10777665 HDOG 10778414
$1 million $1 million $1 million $1 million
=======================================================================================
 1990-1991 1991-1992 1992-1993 1993-1994
---------------------------------------------------------------------------------------
ICSOP
XXXX-XXXX
08/01/90-08/01/91
$5 million excess
of $6 million
---------------------------------------------------------------------------------------
International ICSOP ICSOP ICSOP
XXX-XXXXXX-X XXXX-XXXX XXXX-XXXX XXXX-XXXX

*93
08/01/90-08/01/91 08/01/91-08/01/92 09/01/92-09/01/93 09/01/93-09/01/94
$5 million excess $10 million excess $10 million excess $10 million excess
of $1 million of $1 million of $1 million of $1 million
---------------------------------------------------------------------------------------
INA INA Zurich Zurich
HDOG 14420757 HDOG 15190413 XX-XX-XXX-XX XX-XX-XXX-XX
08/01/90-08/01/91 08/01/91-08/01/92 9/1/92-09/01/93 9/1/93-09/01/94
$1 million $1 million $1 million $1 million
---------------------------------------------------------------------------------------
 1994-1995 1996-1997
----------------------------------------
ICSOP
XXXX-XXXX
12/1/94-12/01/95
$10 million excess
of $1 million
----------------------------------------
Zurich Zurich
XX-XX-XXX-XX XX-XX-XXX-XX
12/01/94-12/01/95 03/01/96-03/01/97
$1 million $1 million
----------------------------------------

NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, parts VII, VIII, IX, X and XI of this opinion are not certified for publication.
[1] The respondents are: Insurance Company of the State of Pennsylvania (ICSOP), Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America) (INA), Pacific Employers Insurance Company (Pacific), St. Paul Surplus Lines Insurance Company (St. Paul), International Insurance Company (International), Puritan Insurance Company (Puritan), Transcontinental Insurance Company (Transcontinental), Old Republic Insurance Company (Old Republic), Twin City Fire Insurance Company (Twin City), Great American Surplus Lines Insurance Company (Great American), and Harbor Insurance Company (Harbor).

With the exception of Harbor, all respondents appear in case No. A109755. Harbor appears in case No. Al 12856. On our own motion and by an order separately filed, we have consolidated the two appeals.
[2] In 1986, the standard CGL policy was amended, and one of the changes altered its name from comprehensive general liability insurance policy to commercial general liability insurance policy. (Certain Underwriters at Lloyd's of London v. Superior Court (2001) 24 Cal.4th 945, 959, fn. 3, 103 Cal.Rptr.2d 672, 16 P.3d 94 (Powerine I).) Throughout the balance of the opinion, we refer to each as a CGL policy.
[3] All respondents are named in this complaint, and each filed a demurrer. The Harbor policy was addressed separately in a motion for judgment on the pleadings filed by Harbor, because no stipulation regarding the content of its policy was obtained until after the trial court hearing on the demurrer.

In the complaint, Ameron also sued Zurich Insurance Company (Zurich), which issued Ameron three primary liability policies between September 1, 1992 and March 1, 1997. Zurich is not a party to this appeal.
[4] "In 1986, the standard insurance form was amended to define `suit' as `a civil proceeding in which damages because of [certain specified injuries] to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.' [Citations.]" (Foster-Gardner, supra, 18 Cal.4th at p. 864, fn. 3, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
[5] In granting Harbor's motion for judgment on the pleadings and sustaining the other respondents' demurrers, the trial court concluded Ameron could not prevail against the respondents as a matter of law. To the extent we reverse, we conclude only that a particular insurance company may have a duty to defend and/or indemnify. Nothing we say in this opinion is intended to express any view regarding additional coverage defenses that were not raised in the trial court or on appeal.
[6] Preliminarily, we note that the parties cite to matters not alleged in the complaint, attached to the complaint or judicially noticed by the trial court. Since those matters are outside the scope of our review of the demurrers and judgment on the pleadings, we disregard them.
[7] Kiewit is not a party to this appeal.
[8] The Ninth Circuit appeal is not a subject of the instant coverage action.

Solely as to INA, Ameron alleged in its first cause of action of the operative complaint that INA breached a duty to defend Ameron in the CAWD action. Because Ameron does not assert any claim of error as to the court's sustaining of INA's demurrer to this cause of action, we consider any such claim of error abandoned. (See Campos v. Anderson (1997) 57 Cal.App.4th 784, 794, fn. 3, 67 Cal.Rptr.2d 350.)
[9] We reject the January 18, 2006 request by Transcontinental and the February 10, 2006 joinder by Great American that we take judicial notice of the contracting officer's two final decisions because those decisions are irrelevant to our decision.
[10] Ameron asserts in its opening brief that the IBCA litigation was prosecuted and paid for by Ameron in Kiewit's name, and in this action Ameron is seeking insurance coverage for itself and on behalf of Kiewit.
[11] Whether Truck compensated Ameron for its defense costs and/or for the settlement it paid is unclear from the face of the complaint. Truck was neither named as a defendant in the instant action nor is it a party to this appeal.
[12] With the exception of Transcontinental, each of respondents' policies for the relevant periods were deemed to be attached to the complaint.
[13] Attached as an appendix to this opinion is a coverage chart.
[14] Primary insurance "is insurance coverage whereby ... liability attaches immediately upon the happening of the occurrence that gives rise to liability. [Citation.]" (Olympic Ins. Co. v. Employers Surplus Lines Ins. Co. (1981) 126 Cal.App.3d 593, 597, 178 Cal.Rptr. 908; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 8:176, p. 8-44.) A liability insurer providing such coverage has the primary duty to defend and indemnify the insured unless specific policy language provides an excuse or exclusion from coverage. (Croskey et ah, at p. 8-45.)
[15] Excess insurance provides coverage only after a predetermined amount of underlying primary insurance is exhausted. (Wells Fargo Bank v. California Ins. Guarantee Assn. (1995) 38 Cal.App.4th 936, 940, fn. 2, 45 Cal.Rptr.2d 537; Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 8:177, at p. 8-45.) Umbrella policies provide "`alternative primary coverage as to losses "not covered by" the primary policy.' [Citations.]" (Powerine II, supra, 37 Cal.4th at pp. 398-399, 33 Cal. Rptr.3d 562, 118 P.3d 589.) Umbrella policies are usually excess policies in that they provide coverage that is excess over underlying primary insurance. (Croskey et al., ¶ 8:203, p. 8-49.)
[16] Though the complaint recites that many of respondent insurers issued multiple policies to Ameron during the relevant period, the causes of action are organized without regard to this. For example, INA issued Ameron four separate, successive policies between August 1, 1988 and August 1, 1992. But the causes of action naming INA do not plead the policies separately. Since a demurrer cannot be sustained (or a judgment on the pleadings granted) to part of a cause of action (PH II, Inc. v. Superior Court (1995) 33 Cal.App.4th 1680, 1682, 40 Cal.Rptr.2d 169), we must reverse as to any cause of action if even a single policy alleged in that cause of action provides a duty of coverage.
[17] In 1986, the standard CGL form was amended to define "suit." (See fn. 4, ante, p. 63.)
[18] The nine policies covered periods from 1973 through February 1983. (Powerine II, supra, 37 Cal.4th at p. 384, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
[19] "A `following form' policy incorporates the terms and conditions of another carrier's policy and provides the same scope of coverage as the underlying policy. [Citation.]" (Wells Fargo Bank v. California Ins. Guarantee Assn., supra, 38 Cal.App.4th at p. 940, 45 Cal. Rptr.2d 537.)
[20] The "`assistance and cooperation'" clause provided that the insurer has the right and opportunity to associate with the insured or the insured's underlying insurers in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit appears reasonably likely to involve the insurer. (Powerine II, supra, 37 Cal.4th at p. 400, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
[21] The court acknowledged that the condition could ultimately defeat recovery, but that issue was not before the court, which was reviewing the trial court's grant of a motion for summary adjudication of issues relating solely to coverage. (Powerine II, supra, 37 Cal.4th at pp. 400-401, 404, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
[22] The Powerine II court found it "significant" that the policies before it did not contain a "no action" clause. A typical no action clause bars any action against the insurer until the insured's liability to the claimant has been determined by a final judgment or a settlement approved by the insured. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 7:394, p. 7A-131; accord, Powerine II, supra, 37 Cal.4th at p. 401, 33 Cal.Rptr.3d 562, 118 P.3d 589.) The court explained that although a standard no action clause serves to discourage collusive settlements between an insured and a third party claimant, it also "appears to spell out the insurer's right to approve any out-of-court settlement, at least for purposes of making it a condition precedent to any suit brought directly against the insurer." (Powerine II, at p. 401, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
[23] The policy covered the period from 1974 through 1977. (Ace, supra, 37 Cal.4th at p. 411, 33 Cal.Rptr.3d 583, 118 P.3d 607.)
[24] The no action clause stated: "`[n]o action shall lie against the [insurer] unless, as a condition precedent thereto, ... the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the [insurer].'" (Ace, supra, 37 Cal.4th at p. 420, 33 Cal.Rptr.3d 583, 118 P.3d 607.)
[25] Apparently, the terms "suit," "claim" and "action" were not defined in the policies.
[26] CDM and Lockheed also involved pollution remediation orders.
[27] INA argues that the deductible endorsement in these policies eliminates any duty to defend contained within the policies' insuring agreements and replaces it with a duty to reimburse Ameron for its defense costs under certain circumstances. Even assuming this is correct, we note that Ameron has alleged in its complaint that INA has failed to perform its obligation to reimburse. Moreover, it would be premature at this time to decide whether or not the duty to reimburse Ameron for its defense costs exists. INA, in fact, concedes this. Thus, we conclude that nothing in the deductible endorsement in these policies justifies the demurrer sustained by the trial court.
[28] Although not binding authority, we note that several out-of-state cases have construed "civil proceeding" within an insurance policy's definition of "suit seeking damages" to include an administrative proceeding. (See Missouri Public Entity Risk v. Investors Ins. (W.D.Mo.2004) 338 F.Supp.2d 1046, 1056; Monarch Greenback, LLC v. Monticello Ins. Co. (D.Idaho 1999) 118 F.Supp.2d 1068, 1074-1075.)
[29] Arbitrators may be granted the authority to award compensatory and punitive "damages." (See, e.g., Cobler v. Stanley, Barber, Southard, Brown & Associates (1990) 217 Cal. App.3d 518, 530, 265 Cal.Rptr. 868; cf. Broughton v. Cigna Healthplans (1999) 21 Cal.4th 1066, 1084, 90 Cal.Rptr.2d 334, 988 P.2d 67.)
[30] INA asserts that Ameron's complaint does not allege that the IBCA proceeding constituted an arbitration and argues, outside the pleadings, that the parties never considered the IBCA proceeding to be an arbitration. But the issue is not whether the IBCA proceeding constitutes an arbitration. The policies' coverage for "suits," defined to include arbitrations, is important because it means that the terms "suit" and "damages" must be defined more broadly than in Foster-Gardner.
[31] Of course, the no action clause may well be determinative at some later stage of the proceedings if there was no valid judgment or settlement.
[32] Ameron asserts that under federal law, i.e., the Act, proceedings before the IBCA and the Court of Federal Claims are both defined as "suits." Because the determination of what constitutes a covered "suit" is made pursuant to California law (see AIU, supra, 51 Cal.3d at p. 831, 274 Cal.Rptr. 820, 799 P.2d 1253), we disregard any assertion by Ameron that the determination of "suit" under federal law is controlling.
[33] Because it is unnecessary to our decision, we do not examine the 1987-1988 International policies (Nos. 531-000426-6 & 531-000481-5).
[34] Because we conclude the 1984-1985 Twin City policy (No. TXU-111849) provides coverage to Ameron, and this conclusion requires us to reverse the trial court's ruling on causes of action 24, 25, 26 and 29, we need not discuss the Twin City 1982-1984 policies (Nos. TXU-103836 & TXU-106532).
[35] The Transcontinental policy is not appended to the complaint.
[36] In the Powerine II policy, "ultimate net loss" was defined as, "`the total sum which the Insured, or any company as his insurer, or both, become obligated to pay by reason of ... property damage ... either through adjudication or compromise, and shall also include ... expenses ... for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder....'" (Powerine II, supra, 37 Cal.4th at p. 386, 33 Cal.Rptr.3d 562, 118 P.3d 589.)
[37] Each of these ICSOP excess/umbrella policies overlies a Zurich primary policy. The Zurich policies are not appended to the complaint. However, the complaint alleges: "The Zurich policies provide that Zurich 'will pay those sums that the insured becomes legally obligated to pay as damages because of ... "property damage"'; and that Zurich `will have the right and duty to defend any "suit"` seeking those damages. [¶] The Zurich policies define `suit' as follows: `"suit"' means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.'" Arguably, the Zurich policies' language may have provided Ameron defense and indemnity coverage for settlement of the IBCA proceeding.
[38] The 1988-1989 International policy, in turn, overlies an INA primary policy. However, the 1987-1988 International policy overlies and incorporates a primary policy issued by Truck. The Truck policy is not attached to the complaint and the complaint does not allege whether or not Truck provided Ameron indemnity and/or defense coverage for the IBCA litigation. If it had been necessary to resolve coverage under this St. Paul policy, we would have followed the analysis in parts III. and IV., ante. Our resolution of the 1988-1989 St. Paul policy renders that unnecessary.
[39] As we noted previously, Coverage B of the International policy provides: "With respect to any loss covered by the terms and conditions of this policy, but not covered as warranted by the underlying [INA] policies ..., or any other underlying insurance, we will pay on your behalf for loss caused by an `occurrence'...." "Loss" is not defined in the International policy.
[**] See footnote *, ante.
[48] The information contained in this chart the copies of insurance policies appended s obtained from the complaint and from thereto or provided in the record on appeal.